UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
BRIAN FITZGERALD and TARYN M.
FITZGERALD as Executors of the Estate of
FREDERICK J. BYRNE, Deceased,

                       Plaintiffs,                    **REPORT AND**
                                                          **RECOMMENDATION**
            -against-                                  CV 19-4350 (JS)(AYS)

UNITED STATES OF AMERICA,

                       Defendant.
-------------------------------------------------------------------X
**ANNE Y. SHIELDS, United States Magistrate Judge:**

      Before the Court, on referral from the Honorable Joanna Seybert, is Defendant's motion to dismiss and for summary judgment, pursuant to Rules 12(h)(3) and 56 of the Federal Rules of Civil Procedure. Plaintiffs oppose the motion. For the following reasons, this Court respectfully recommends that Defendant's motion be granted in part and denied in part.

BACKGROUND

      The relevant facts, as set forth below, are taken from those portions of the parties' Local Civil Rule 56.1 statements upon which they agree, as well as the documents offered by the parties in support of and in opposition to the within motion.

I.      Decedent's Conditions and Treatment

      Decedent, Frederick J. Byrne ("Byrne" or "Decedent"), the father of Plaintiff Taryn Fitzgerald ("Taryn"), and father-in-law of Plaintiff Brian Fitzgerald ("Brian") (collectively, "Plaintiffs" or the "Fitzgeralds"), was transferred to the Veteran Affairs Medical Center Northport Community Living Center I ("VAMC Northport") from LIJ Valley Stream/Northwell Health Hospital on July 1, 2016 for long-term skilled nursing care. (Def. Local Civ. R. 56.1

Statement ("Def. 56.1") ¶ 5.) Prior to that, Byrne resided with Plaintiffs in their two-family home. (Id. ¶ 6.)

On or about August 9, 2016, Byrne was transferred to the VAMC Community Living Center 3 ("CLC3"), a nursing home on the grounds of the VAMC Northport for residents with impaired mental abilities or who are deemed a risk for elopement. (Id. ¶¶ 9-10.) Byrne was admitted to CLC3 because he was an elopement risk, which required him to be placed in a lockdown unit, and due to declines in his functional ability and mobility. (Id. ¶ 9; Pl. Local Civ. R. 56.1 Statement ("Pl. 56.1") ¶ 3.) Byrne was diagnosed with dementia with behavioral disturbance, chronic post-traumatic stress disorder, alcohol dependence, tobacco use disorder, cognitive disorder, psychosis, and anxiety disorder. (Def. 56.1 ¶ 11.) Byrne also had a history of schizoaffective disorder. (Pl. 56.1 ¶¶ 1-2.)

A fall risk assessment was conducted for Byrne on August 12, 2016, approximately seventy-two hours post-admission to CLC3, wherein he was deemed a fall risk level 3, which is the highest risk category under VAMC Northport's fall prevention policy. (Def. 56.1 ¶ 13; Pl. 56.1 ¶ 12.) The August 12, 2016 fall risk assessment notes that Byrne "uses [wheelchair] appropriately" under the "Gait/Transferring" section. (Def. 56.1 ¶ 14.) Fall risk assessments were conducted for Byrne on a monthly basis between August 2016 and June 2017. (Id. ¶ 15.) Byrne was deemed a fall risk level 3 each time. (Id.)

Another fall risk assessment was conducted for Byrne on July 16, 2017. (Def. 56.1 ¶ 16.) Byrne was again assessed at a fall risk level 3. (Id.) A physical therapy consult was conducted for Byrne on July 17, 2017 (the "July 17 Consult"). (Pl. 56.1 ¶ 5.) The July 17 Consult indicates that Byrne had a score of fifteen seconds on the "Timed Up and Go" test and a 17 out of 28 on the Tinetti Test, which assesses gait and balance. (Pl. 56.1 ¶¶ 5-6.) Byrne's Tinetti Test result

2

indicated that he had "weakness" in connection with his "gait/transferring." (Id. ¶ 7.) The July 17 Consult also indicated that had balance issues when walking. (Id. ¶¶ 8-9.) Finally, the July 17 Consult noted that Byrne required "[one] h[ou]r observation with toileting and comfort rounds," that he used furniture "for support while walking," and that the "Care Plan [did] not require a change at [that] time." (Def. 56.1 ¶ 17.)

On August 1, 2017, VAMC Northport held Byrne's annual interdisciplinary meeting, wherein his medical team continued to assess him as a fall risk level 3. (Id. ¶ 18.) Under the VAMC Northport Fall Prevention/Reduction Policy, fall risk level 3 precautions require one hour observation with toileting and comfort rounds, including positioning, offering fluids and snacks when appropriate, and ensuring the patient is warm and dry. (Id. ¶ 19; Pl. 56.1 ¶ 17.) Byrne had no fall history as a resident of the VAMC Northport prior to August 7, 2017. (Def. 56.1 ¶ 20.) His medical records indicate that he ambulated with assistance from a wheelchair on August 6, 2017. (Id. ¶ 21.) The records further indicate that Byrne was able to use the bathroom and clean himself independently and to arrange his clothes on August 6, 2017. (Id. ¶ 22.)

II.   Decedent's Medical Condition on August 7, 2017

At or around 6:58 a.m. on August 7, 2017, Byrne complained of chest pain and was transferred to the hospital portion of VAMC Northport. (Id. ¶ 24.) His vital signs indicated a temperature of 98.1, pulse of 82, respirations of 20, and blood pressure of 111/86. (Id. ¶ 25.) No changes were observed in Byrne's mental status or behavior. (Id.)

Byrne arrived at the VAMC Northport emergency room ("ER") at 7:13 a.m. on August 7, 2017. (Id. ¶ 26.) He presented to the ER with complaints of "on and off" chest pain for a "couple of days," stating that the pain was an 8 out of 10 at the time of his arrival at the ER. (Id. ¶ 27.) Byrne did not have shortness of breath, sweating, or radiation of pain to his arm or back. (Id.)

3

His vital signs at the time of admission to the ER were a temperature of 98.4, pulse of 85, respirations of 16, and blood pressure of 142/65. (Id. ¶ 28.) The ER records state that Byrne was "in no acute distress." (Id. ¶ 29.)

Dr. Andrew Lin, the ER physician, ordered a CBC, CMP, PT, PTT, Troponin, EKG, and CXR for Byrne. (Id. ¶ 30.) Byrne's white blood cell count was 14.6, which was higher than normal, and a possible sign of infection. (Id. ¶ 33; Pl. 56.1 ¶ 24.) Troponin – a type of protein found in the blood only when heart muscles have been damaged – was negative. (Def. 56.1 ¶ 32.) A chest x-ray revealed chronic changes due to chronic obstructive pulmonary disease ("COPD") and no significant changes from a previous study conducted on January 31, 2017. (Id. ¶ 34.) At 8:24 a.m., while still in the ER, Byrne denied any further chest pain. (Id. ¶ 35.)

Byrne was ultimately diagnosed with pleurisy – inflammation of the tissues that line the lungs and chest cavity – and returned to CLC3 at or around 10:20 a.m. on August 7, 2017. (Id. ¶¶ 37-38.) Upon his return to CLC3, Byrne denied any pain or discomfort. (Id. ¶ 39.) Per VAMC Northport protocol, Amandeep Jassal ("Jassal"), a registered nurse, took and recorded Byrne's vitals, assessed him, and wrote a progress note upon his return to CLC3. (Id. ¶ 40.) Byrne's vital signs were a temperature of 97.6, pulse of 99, respirations of 18, and blood pressure of 120/80. (Id. ¶ 41.) Jassal's progress note stated that Byrne's doctor – Dr. Yeh – "ordered urine analysis and UA culture, collected and sent to lab for processing, awaiting results. Will continue to monitor." (Id. ¶ 42.)

III. Decedent's Fall and Subsequent Treatment

At 2:41 p.m. on August 7, 2017, Dr. Yeh noted that Byrne had an elevated white blood cell count of "unknown source" and created a plan to repeat the CBC but to hold off on antibiotics at that point. (Id. ¶ 44.) At or around 2:47 p.m. that day, Bryne fell in his room while

4

alone and was discovered by the nursing staff. (Id. ¶ 48; Pl. 56.1 ¶ 39.) Jassal's "Post Fall" note states that Byrne "stated that he fell on the floor" and that his initial lying blood pressure was 64/34, with a pulse of 102, and that the standing or sitting blood pressure was 123/33, with a pulse of 56. (Id. ¶ 50.)

Byrne was again taken to the ER where his blood pressure taken at 3:27 p.m. was 103/66. (Id. ¶ 55.) Byrne's blood pressure was taken again at 4:11 p.m. and was 80/45. (Id. ¶ 56.) Troponin was still negative at 4:22 p.m. (Id. ¶ 57.) IV fluids were administered at 4:45 p.m. (Id. ¶ 58.) Blood cultures drawn that day tested positive for staph infection and a repeat culture came back positive. (Pl. 56.1 ¶ 43.) Byrne's blood pressure was taken repeatedly on August 7, 2017 between 5:00 p.m. and 8:00 p.m., with readings of 112/58, 122/68, 118/76, and 126/76. (Def. 56.1 ¶¶ 59-63.) Byrne did not complain of shortness of breath or chest pain. (Id. ¶ 61.) A CT chest angiography performed at 7:31 p.m. was negative for pulmonary embolism. (Id. ¶ 64.)

Byrne was diagnosed with an acute comminuted fracture of the right femoral neck and an orthopedic consultation was obtained. (Id. ¶ 65.) Byrne was admitted to the VAMC hospital, internal medicine, at or around 11:20 p.m. on August 7, 2017. (Id. ¶ 66.) After consultation with orthopedics, surgery was recommended for the next day – August 8, 2017. (Id. ¶ 67.) Taryn Fitzgerald consented, and surgery was performed. (Id. ¶ 68.)

On August 10, 2017, Brunilda Lopez ("Lopez"), a physical therapist, conducted a physical therapy post fall assessment for Byrne. (Id. ¶ 69.) Lopez's assessment noted that "staff reports that [Byrne] was not himself after return back to CLC3 after first return from the ER" and "as per staff [Byrne] was not his usual self." (Id. ¶ 70.) No further details were noted, however.

At 5:55 a.m. on August 13, 2017, Byrne was noted by CLC3 staff to have stopped breathing and CPR was begun. (Id. ¶ 77.) Code blue was called to the ER while Byrne was en

5

route from CLC3. (Id. ¶ 78.) Byrne arrived at the ER unresponsive with CPR in progress at 6:10 a.m. (Id.)

Emergency room personnel administered treatment to Byrne for forty-seven minutes, but he remained asystole the entire time and neither electrical activity nor a pulse could be established. (Id. ¶ 79.) Byrne's time of death was noted at 6:42 a.m. on August 13, 2013. (Id. ¶ 80.) The autopsy report lists "Hypertensive and Atherosclerotic Heart Disease" as the primary cause of death, with "Fracture of Left Hip, Surgically Repaired" listed as a "contributory" factor. (Id. ¶¶ 81-82.)

IV.   Procedural Background

Plaintiffs commenced the within action on July 29, 2019. (Compl., Docket Entry ("DE"), [1].) Defendant, the United States of America ("Defendant" or the "Government"), filed an Answer to Plaintiffs' Complaint on October 22, 2019. (DE [17].) Discovery proceeded smoothly and closed in June 2021. After extensions were afforded by the District Court, the Government filed the within motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(h)(3) and for summary judgment on May 10, 2022. (DE [40].) The motion was fully briefed on August 4, 2022, and was referred to the undersigned for report and recommendation on April 27, 2023. The Court now turns to the merits of the motion.

DISCUSSION

I.   Legal Standards

A.   Motion to Dismiss Pursuant to Rule 12(h)(3)

Pursuant to Federal Rule of Civil Procedure 12(h)(3), "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). "Rule 12(h)(3) motions are subject to the same standard as motions brought pursuant

6

to Rule 12(b)(1)." Reese v. Approved Funding Corp., No. 12-CV-3307, 2013 WL 4520427, at *2 (E.D.N.Y. Aug. 26, 2013) (quoting Peterson v. Cont'l Airlines, Inc., 970 F. Supp. 246, 248-49 (S.D.N.Y. 1997)).

A district court should dismiss a case for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) where the court "lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). When reviewing a motion to dismiss for lack of jurisdiction, "the court 'must accept as true all material factual allegations in the complaint, but [the court is] not to draw inferences from the complaint favorable to plaintiff[].'" Tiraco v. N.Y. State Bd. of Elections, 963 F. Supp. 2d 184, 191 (S.D.N.Y. 2013) (quoting J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F F.3d 107, 110 (2d Cir. 2004)) (alteration in original). The Court may also "consider affidavits and other materials beyond the pleadings to resolve the jurisdictional question." Ighile v. Kingsboro ATC, No. 16-CV-4294, 2018 WL 1970737, at *2 (E.D.N.Y. Apr. 25, 2018) (citing cases).

B.   Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to establish the lack of any factual issues. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The very language of this standard dictates that an otherwise properly supported motion for summary judgment will not be defeated because of the mere existence of some alleged factual dispute between the parties. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Rather, the requirement is that there be no "genuine issue of material fact." Id. at 248.

The inferences to be drawn from the underlying facts are to be viewed in the light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). When the moving party has carried its burden, the party opposing summary judgment must do more than simply show that "there is some metaphysical doubt as to the material facts." Id. at 586. In addition, the party opposing the motion "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing there is a genuine issue for trial." Anderson, 477 U.S. at 248.

II.    The Government's Motion to Dismiss

The Government moves to dismiss any claim by Plaintiffs for medical malpractice premised on VAMC Northport's purported failure to provide Byrne with cardiac care at the time he was cleared for hip surgery following his August 7, 2017 fall. (Def. Mem. of Law in Supp. 8-9.) According to the Government, the Court lacks subject matter jurisdiction over any such claim because Plaintiffs failed to exhaust administrative remedies pursuant to 28 U.S.C. § 2675, which requires a plaintiff to exhaust administrative remedies, pursuant to the Federal Tort Claim Act's presentment requirements, prior to asserting a tort claim in federal district court. (Id. at 7 (citing cases).)

In their opposition to the within motion, Plaintiffs state, in a footnote, that "[a]s the United States notes, questions of appropriate cardiac treatment or lack thereof following Decedent's fall are tangential to this action, and are not the core claims raised in Plaintiffs' pre-action submission to the Department of Veterans Affairs for settlement purposes." (Pl. Mem. of Law in Opp'n 2 n.1.) Accordingly, Plaintiffs do not appear to dispute the Government's position that the Court lacks subject matter jurisdiction over any claim relating to any cardiac care – or the lack thereof – provided to Byrne prior to his hip surgery. In fact, Plaintiffs' opposition does

8

not address the Government's motion to dismiss in any way, focusing instead solely on the motion for summary judgment. As such, the Court may treat any such claim as abandoned. See Ross v. Port Chester Housing Auth., No. 17-CV-4770, 2019 WL 4738941, at *7 (S.D.N.Y. Sept. 27, 2019) ("It is well-settled that the failure to oppose an argument raised in a motion to dismiss is deemed a concession of the argument and abandonment of the claim.") (collecting cases).

Based on the foregoing, this Court respectfully recommends that the Government's motion to dismiss any claim by Plaintiffs pertaining to the purported failure to provide Byrne with cardiac care at the time he was cleared for hip surgery following his August 7, 2017 fall be granted.

III.   The Government's Motion for Summary Judgment

The Complaint herein sets forth three causes of action: (1) medical malpractice; (2) negligence; and, (3) wrongful death. The Government seeks summary judgment with respect to all claims asserted.

   A.   Medical Malpractice

"To establish a claim for medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries." Arkin v. Gittleson, 32 F.3d 658, 664 (2d Cir. 1994) (citing cases). "It is well established in New York law that 'unless the alleged act of malpractice falls within the competence of a lay jury to evaluate, it is incumbent upon the plaintiff to present expert testimony in support of the allegations to establish a prima facie case of malpractice.'" Sitts v. United States, 811 F.2d 736, 739 (2d Cir. 1987) (quoting Keane v. Sloan-Kettering Inst. for Cancer Research, 464 N.Y.S.2d 548, 549 (2d Dep't 1983)) (additional citations omitted). The medical malpractice case where expert medical testimony is not required

is considered "rare." Sitts, 811 F.2d at 740 (citation omitted). Failure to present expert testimony in support of a medical malpractice claim is fatal to the claim. See id. (citing cases).

The Government moves for summary judgment with respect to Plaintiffs' medical malpractice claim on the ground that the testimony and opinion offered by Plaintiffs' medical expert, Dr. Jeffrey M. Kagan, is inadmissible because it is speculative and not based on the record. (Def. Mem. of Law in Opp'n 13-19.) Even if Dr. Kagan's testimony is found to be admissible, the Government argues that it fails to raise a triable issue of fact with respect to Plaintiffs' medical malpractice claim. (Id. 20-22.)

        1.        Admissibility of Expert Evidence

"The determination of whether testimony is admissible as an expert opinion is multi-factored and flexible." Paul v. City of New York, No. 16-CV-1952, 2023 WL 3724152, at *4 (S.D.N.Y. May 30, 2023) (citation omitted). Federal Rule of Evidence 702 pertains to the evaluation of the admissibility of expert opinions and provides that such opinions may be admitted where:

> (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The fundamental requirements are thus that such evidence be relevant and reliable." United States v. Jones, 965 F.3d 149, 161 (2d Cir. 2020).

"'An expert's opinions that are without factual basis and are based on speculation or conjecture are . . . inappropriate material for consideration on a motion for summary judgment,' as are "[a]n expert's conclusory opinions." Paul, 2023 WL 3724152, at *4 (quoting Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008)) (alteration in

10

original). However, the inquiry to be performed by the court is "limited" and "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." Paul, 2023 WL 3724152, at *4 (quoting Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002)) (alteration in original). A court "should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." Paul, 2023 WL 3724152, at *4 (quoting Amorgianos, 303 F.3d at 267).

    2.    Application

The Government does not challenge Dr. Kagan's qualifications; thus, the Court finds no need to discuss them in connection with the instant report and recommendation. Rather, the Government takes issue with Dr. Kagan's opinion itself, arguing that it is based on pure speculation. Conversely, Plaintiffs argue that Dr. Kagan's opinion is supported by record evidence. The Court has reviewed Dr. Kagan's expert report, as well as his deposition testimony, and finds that it satisfies the requirements of Federal Rule 702. The issues the Government raises are matters for cross-examination, not exclusion, and therefore, Plaintiffs have sustained their burden of producing expert medical testimony to support their claim for medical malpractice.

    3.    Issues of Fact

Alternatively, the Government argues that even if Dr. Kagan's expert opinion is deemed admissible, his opinion fails to raise issues of triable fact. "Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions. Such conflicting expert opinions will raise credibility issues which can only be resolved by a jury." Paul, 2023 WL 3724152, at *13 (citation and internal quotation marks omitted) (collecting cases). That is precisely the case here. Both parties have proffered

11

expert medical testimony that contradict one another. It is up to the trier of fact to determine credibility.

Based on the foregoing, this Court respectfully recommends that the Government's motion for summary judgment be denied with respect to Plaintiffs' claim for medical malpractice. The Court further recommends that any motion to strike an expert – by either side – be permitted to be renewed as a motion in limine at or before the time of trial, in accordance with the procedures and preferences of the District Court.

B.  Negligence

The Government also seeks summary judgment on Plaintiffs' claim for negligence, arguing that while Plaintiffs assert both theories of negligence and medical malpractice in their Complaint, all of their allegations sound in medical malpractice, not ordinary negligence. (Def. Mem. of Law in Supp. 11.) Plaintiffs oppose this portion of the motion, asserting that claims brought under the FTCA concerning VA patients or residents may assert a mixture of medical malpractice and negligence. (Pl. Mem. of Law in Opp'n 7.)

"In New York, '[a]n action to recover for personal injuries or wrongful death against a medical practitioner or a medical facility or hospital may be based either on negligence principles or on the more particularized medical malpractice standard.'" Kushner v. Schervier Nursing Care Ctr., No. 05 Civ. 5297, 2011 WL 1201936, at *5 (S.D.N.Y. Mar. 23, 2011) (quoting Friedmann v. New York Hosp.-Cornell Med. Ctr., 884 N.Y.S.2d 733, 734 (1st Dep't 2009)). However, "the distinction between medical malpractice and negligence is a subtle one, for medical malpractice is but a species of negligence and 'no rigid analytical line separates the two.'" Weiner v. Lenox Hill Hosp., 88 N.Y.2d 784, 787 (1996) (quoting Scott v. Uljanov, 74 N.Y.2d 673, 674 (1989)).

12

To determine which cause of action the claim sounds in, the Court must first parse out the nature of the duty to Byrne that Plaintiffs allege Defendant breached – whether it (1) "arises from the physician-patient relationship or is substantially related to medical treatment," making it medical malpractice, or (2) the provider failed "to fulfill a different duty," rendering it ordinary negligence. United States v. Gjini, No. 16-CV-3707, 2019 WL 498350, at *9 (S.D.N.Y. Feb. 8, 2019) (citations and internal quotation marks omitted). Accordingly, a claim sounds in medical malpractice "when the challenged conduct 'constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician.'" Weiner, 88 N.Y.2d at 788 (quoting Bleiler v. Bodner, 65 N.Y.2d 65, 72 (1985)). "The distinction . . . turns on whether the acts or omission complained of involve a matter of medical science or art requiring special skills not ordinarily possessed by lay persons or whether the conduct complained of can instead by assessed on the basis of the common everyday experience of the trier of the facts." Gjini, 2019 WL 498350, at *9 (citations and internal quotation marks omitted).

"In New York case law delineating this distinction, the appellate courts have determined that it is possible to allege a mixture of medical malpractice and negligence." Greasley v. United States, No. 15-CV-642, 2021 WL 935731, at *5 (W.D.N.Y. Mar. 11, 2021) (citing D'Elia v. Menorah Home & Hosp. for the Aged & Infirm, 859 N.Y.S.2d 224 (2d Dep't 2008)). Moreover, "[w]hen a risk of harm has been identified through the exercise of medical judgment, a failure to take measures to prevent the harm may constitute actionable ordinary negligence." Greasley, 2021 WL 935731, at *5 (quoting Gjini, 2019 WL 498350, at *9) (collecting cases). In accord with this standard, the allegation that VAMC Northport knew that Byrne was a fall risk, yet failed to take reasonable precautions to prevent him falling sets forth a claim of negligence, separate and apart from the medical malpractice claim Plaintiffs assert with respect to Byrne's

diagnosis and treatment at the VAMC ER. This Court finds that Plaintiffs have adequately put forth evidence for two distinct claims – negligence and medical malpractice. Genuine issues of material fact exist with respect to both. As such, this Court respectfully recommends that the Government's motion for summary judgment with respect to Plaintiffs' negligence claim be denied.

    C.    <u>Wrongful Death</u>

Finally, the Government moves for summary judgment with respect to Plaintiffs' claim for wrongful death on the ground that Plaintiffs have not demonstrated any pecuniary loss. (Def. Mem. of Law in Supp. 23-25.) Plaintiffs oppose the motion, asserting that the record is replete with evidence of injuries for which they may recover. (Pl. Mem. of Law in Opp'n 18-20.)

"Under New York law, wrongful death damages are limited to 'fair compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought.'" <u>McKee v. Colt Electronics Co., Inc.</u>, 849 F.2d 46, 50 (2d Cir. 1988) (quoting N.Y. Est. Powers & Trust Law § 5-4.3(a)) (additional citation omitted). "There is no prohibition barring such recovery by an adult child." <u>Mono v. Peter Pan Bus Lines, Inc.</u>, 13 F. Supp. 2d 471, 477 (S.D.N.Y. 1998) (citing cases).

While "[t]he statute does not permit recovery for grief or for 'loss of society [or] affection,'" <u>McKee</u>, 849 F.2d at 50 (quoting <u>Liff v. Schildkrout</u>, 49 N.Y.2d 622, 623 (1980)) (additional citations omitted), children "may recover for the pecuniary loss suffered as a result of the lost nurture, care, and guidance they would have received if the parent had lived." <u>McKee</u>, 849 F.2d at 50 (citing cases). "[T]he essence of the cause of action for wrongful death in [New York] is that the plaintiff's reasonable expectancy of future assistance or support by the decedent was frustrated by the decedent's death." <u>Gonzalez v. New York City Housing Auth.</u>, 77 N.Y.2d

14

663, 668 (1991) (citation omitted). As the New York courts have repeatedly emphasized, each case must be decided on its individual merits. See McKee, 849 F.2d at 51 (citing cases).

The record before the Court is replete with triable questions of fact as to Plaintiffs' wrongful death claim. While the Government argues that Plaintiffs cannot demonstrate any pecuniary loss because Byrne's daughter, Taryn, is married, has children and is a partner at a law firm, the standard set forth above makes clear that such recovery is not limited to financial assistance provided by the decedent. Rather, as stated above, the case law permits recovery for lost nurture, care, and guidance. Taryn testified as to such damages at her deposition. The trier of fact should be permitted to determine the credibility of her testimony and, ultimately, the value, if any, of compensable loss to Plaintiffs.

Based on the foregoing, this Court respectfully recommends that the Government's motion for summary judgment with respect to Plaintiffs' wrongful death claim be denied.

## RECOMMENDATION

For the foregoing reasons, this Court respectfully recommends that Defendant's motion to dismiss and for summary judgment be granted in part and denied in part. Specifically, the Court recommends that the motion to dismiss, brought pursuant to Federal Rule of Civil Procedure 12(h)(3), be granted, and that the motion for summary judgment be denied in its entirety.

## OBJECTIONS

A copy of this Report and Recommendation is being provided to all counsel via ECF. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of filing of this report. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the

District Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or Court of Appeals. Thomas v. Arn, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision").

**SO ORDERED:**

Dated: Central Islip, New York
August 24, 2023

/s/    Anne. Y. Shields
ANNE Y. SHIELDS
United States Magistrate Judge